IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

ODYSSEY MARINE EXPLORATION, INC.　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiff,　　　　　　　: CIVIL ACTION
　　　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　: Case No: 8:07-CV-00616- SDM-MAP
　　　　　　　　　　　　　　　　　　:
THE UNIDENTIFIED, SHIPWRECKED VESSEL,:
its apparel, tackle, appurtenances and　　:
cargo located within a five mile radius of the　:
center point coordinates provided to the Court　:
under seal,　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　Defendant;　　　　　　　:
　　　　　　　*in rem*　　　　　　　　:
and　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　:
The Kingdom of Spain,　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　Claimant.　　　　　　　:
_____/ :

## PLAINTIFF'S RESPONSE TO COURT ORDER SCHEDULING PRELIMINARY PRETRIAL CONFERENCE AND ANSWERS TO STANDARD INTERROGATORIES

COMES NOW the Plaintiff, ODYSSEY MARINE, EXPORATION, INC. ("ODYSSEY") by and through its undersigned counsel and files this, it Response to the Court's Order Scheduling Preliminary Pretrial Conference And Answers to Standard Interrogatories, and responds to Plaintiff's Interrogatories as follows:

# PLAINTIFF'S INTERROGATORY #1

**Describe the basis of federal jurisdiction – including all laws, acts having the force and effect of law, codes, regulations and legal principles, standards and customs or usages – which the plaintiff contends are applicable to the instant action.**

As a case involving an admiralty and maritime claim, this Court has jurisdiction over the subject matter pursuant to the Constitution of the United States, Article III, Section 2, Clause 1, 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure. Claims arising out of salvage operations are clearly within the admiralty jurisdiction of the federal courts. *See Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 566-67 (5th Cir. 1981) (*Treasure Salvors III*). Furthermore, U.S. admiralty courts unquestionably have jurisdiction to adjudicate salvage claims based on salvage operations that occur on the high seas. *See Treasure Salvors III*, 640 F.2d at 566-67 ("The subject matter jurisdiction thus granted is not limited to causes of action arising from acts or occurrences on the territorial waters of the United States."); *Treasure Salvors I*, 569 F.2d at 334 ("the presence of the *res* within the district is not an absolute prerequisite to the court's jurisdiction."). It is common for U.S. admiralty courts to assert *in rem* jurisdiction over shipwrecks located in international waters and even within the territorial seas of foreign nations. *See Marex v. Unidentified, Wrecked and Abandoned Vessel*, 952 F. Supp. 825, 828 (S.D. Ga. 1997); *R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel*, 924 F. Supp. 714 (E.D. Va. 1996); *Bemis v. R.M.S. Lusitania*, 884 F. Supp. 1042 (E.D. Va. 1995), *aff'd*, 99 F.3d 1129 (4th Cir. 1996), *cert. denied*, 118 S. Ct. 1558 (1998).

The crux of this specific case is an adjudication of property rights to an unidentified shipwreck and/or cargo located outside the territorial seas and contiguous zone of any

sovereign state. Additionally, prior to this Court obtaining constructive *in rem* jurisdiction over the Defendant site, neither the site, nor any vessel, nor cargo thereof was in the actual possession of Spain, nor any other person, entity or sovereign State. Although Spain seems to allege an ownership interest in Defendant Site, not only has this not been established, but Spain has provided no basis for a claim against a vessel which Odyssey believes to be an Italian-registered passenger ship which sank in 1915. Despite the lack of any evidence for a claim, the Amended Verified Complaint would operate directly against the vessel and cargo and would involve a determination of the potential ownership interest (or lack thereof) of all parties in the property within the jurisdiction of this Court.

It is well settled that a Court sitting in admiralty has jurisdiction to determine ownership interests of salvaged property that has been reduced to the possession and control of the salvor and is before the Court. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 961 (4th Cir. 1999); *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 566 (5th Cir. 1981). The so-called "constructive *in rem*" jurisdiction permits a United States Court sitting in admiralty to adjudicate rights over the entire wreck or cargo. *R.M.S. Titanic, Inc.*, 171 F.3d at 961. The basis for this power is within the jus gentium of the law of nations to which Spain, and all other persons or entities, are similarly bound. *Id.* One of the justifications for constructive *in rem* jurisdiction over shipwrecks or cargo beyond the territorial waters or contiguous zone of any nation is to protect such property from being plundered, to preserve the historic interest, protect the rights of the first salvor, and to return the goods to economic usefulness. Thomas J. Schoenbaum, Admiralty and Maritime Law 179 (4th ed. 2004).

Furthermore, this Court has, or will have during the pendency of this action, jurisdiction over any potential claimant including Claimant, Spain, and/or competing salvors by virtue of its contacts to this forum; the nature of the Plaintiff's admiralty action; the relationship of the potential claimant and/or salvor to the Plaintiff; the submission of a claim (such as that of Spain) by any potential claimant in this forum; and/or under the principles of jurisdiction by necessity. This Court's exercise of jurisdiction over Spain and other competing claimants and/or salvors is necessary to prevent irreparable injury to, or destruction of the Defendant Site; to allow the Plaintiff to continue to pursue its ongoing survey and archaeological recovery operations without interference; to bring the recovered artifacts within this District; to engage in conservation of the artifacts; and to prevent destruction of this Court's actual and potential jurisdiction.

This court has personal jurisdiction specifically over Spain, despite Spain's suggestion to the contrary, based upon the fact that Spain has filed a general appearance through its Verified Claim pursuant to Supplemental Rule C(6) (Dkt. 17). The Verified Claim operates as a general appearance unless it has been expressly restricted to the defense of the *in rem* claim pursuant to Supplemental Rule E(8). *U.S. v. Republic Marine, Inc.*, 829 F.2d 1399, 1402-1403 (7th Cir. 1987). Nowhere in Spain's Verified Claim did it expressly restrict its appearance to the defense of the *in rem* claims.

It should be noted that out of an abundance of caution, Odyssey is taking steps to serve Spain pursuant to the Foreign Sovereign Immunities Act. This Court has issued a Summons to the Kingdom of Spain (Dkt. 47) and, in fact, such service may be effectuated at the time of the Preliminary Pretrial Conference.

In Count V, the Amended Verified Complaint sets forth claims for unjust enrichment and quantum meruit which are equitable theories of recovery often pled in the alternative in salvage actions based on the value of the services provided to a vessel or cargo owner. See e.g., *The Elfrida*, 172 U.S. 186, 194 (1898). The ultimate disposition of Count V depends upon a determination of the ownership of the res; this Court, nevertheless, has jurisdiction to entertain Count V, even against a sovereign state such as Spain. The equitable relief sought in Count V is clearly related to an *in rem* claim for salvage. It alternatively seeks compensation for services rendered to the Defendant res in the event a maritime lien is deemed not to exist. As such, the equitable relief is sought on the theory of benefit to the owner of the Defendant res. In the event Spain is ultimately determined to have ownership rights in the Defendant res, this Court would have subject matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C § 1607. Section 1607 provides that, when a foreign State intervenes in an action, the foreign State will not be immune with respect to any counterclaim "arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state." *Id*. Clearly, Spain has made a Claim of Owner in the Defendant res currently under the jurisdiction of this Court. In the event the property is determined to be that of Spain or any other claimant, and not abandoned, Count V of the Complaint seeks compensation that is clearly related to services provided to the vessel and/or cargo and its owner for the salvage of the property, which arose out of the same subject matter of the claim of the foreign State. Accordingly, Count V falls squarely within an express waiver of Spain's sovereign immunity found within the Foreign Sovereign Immunity Act.

In Count VI of the Amended Verified Complaint, Odyssey alleges that it suffered damages as a result of Spain's tortious conduct in invading its possessory rights to the Defendant res and in interfering in its performance of its duties as substitute custodian. These acts fall squarely within exceptions to the waiver of sovereign immunity found within the Foreign Sovereign Immunities Act. Mainly, Spain is not immune from the jurisdiction of a court in the United States concerning a suit in admiralty to enforce a maritime lien against a vessel or cargo. See 28 U.S.C. § 1605(b).

Spain's actions clearly arise out of Odyssey's arrest of the Defendant res in this case – Spain has interfered with Odyssey's court-ordered duties as substitute custodian and with its ability to continue to perform its archaeological recovery and salvage operations as permitted by this Court. Since Spain's actions are all related to, and are in retaliation for Odyssey's arrest of the Defendant Site and cargo properly before this Court, Spain has waived sovereign immunity and is subject to liability for the acts complained of.

In addition to § 1605(b), Spain has also waived any sovereign immunity under § 1607(b). Section 1607(b) waives sovereign immunity with respect to any counterclaim arising out of the same transaction or occurrence as the subject matter of a claim in which a foreign State intervenes. 28 U.S.C. § 1607(b). Here, Spain intervened in the arrest of the Defendant res by filing a Verified Claim. As detailed in the Amended Verified Complaint, Spain has taken numerous actions interfering with Odyssey's possessory rights and duties as substitute custodian which all relate directly to the salvage of the Defendant Site in this matter. Under 28 U.S.C. § 1607, Spain has therefore waived its sovereign immunity with

6

respect to a counterclaim for damages as a result of Spain's intervention and tortious and illegal conduct arising out of the arrest of the Defendant res.

## PLAINTIFF'S INTERROGATORY #2

**Describe in detail the injuries or damages incurred by plaintiff and the specific acts or omissions by the defendant which have allegedly caused the injuries or damages.**

Odyssey's recovery of artifacts from this and other sites has been the subject of intense international media attention especially in Spain. As a result solely of false media reports, and false allegations by officials in Spain regarding the discovery Odyssey has called the Black Swan, and despite Odyssey's continued assurance that no artifacts have been recovered in Spanish territorial waters, a bogus and prejudicial criminal investigation was launched in Spain against Odyssey under a "secret order." In fact, Odyssey became aware through the Spanish press that Spanish authorities would intercept and inspect Odyssey's vessels, the *Ocean Alert* and the *Odyssey Explorer*, if they attempted to depart Gibraltar where they were docked. Spain rejected and rebuffed Odyssey's attempts to appear in its own defense. Thus, as described in the Amended Verified Complaint, Odyssey prepared a Sworn Statement explaining Odyssey's actions and the facts surrounding the arrest, the recovery, and the subsequent claims and baseless detention of Odyssey's ships by Spain.

Despite the fact that Odyssey provided the Sworn Statement and further information regarding its recovery to Spanish officials, and despite the assurance of a Spanish criminal judge that Odyssey's vessels would not be boarded without the consent of the Master or forcibly taken to a Spanish port, on July 12, 2007, while Odyssey was moving its vessel the *Ocean Alert* from Gibraltar, and while the vessel was in international waters, Spain boarded

the vessel under protest from the Master and illegally seized the vessel forcing it into the Spanish port of Algeciras. Having alerted the Spanish media to the boarding and seizure, Spanish authorities paraded the *Ocean Alert* along the coastline for photographic and video opportunities. Additionally, despite her protests, officials seized the personal computer of one of Odyssey's attorneys and informed her that they intended to copy all information from the computer, which she made clear included attorney/client privileged information regarding Odyssey and other clients.

Once in Algeciras, Odyssey's crew and attorneys were forced by the Spanish officials to sit in the scalding sun for approximately seven hours without food or water or use of the restroom. Their passports were taken, as were all of their electronic equipment (of which the hard drives have been removed and only the empty laptops returned). Spanish officials found no evidence of any wrongdoing on Odyssey's part, and eventually released the *Alert* on June 18, 2007.

On October 16, 2007, the *Odyssey Explorer* attempted to depart the port in Gibraltar and was similarly intercepted, and under threat of force was diverted to the Spanish port of Algeciras, Spain, against the will of the Master. Spanish officials even violated their own "secret order" which Odyssey has since learned allowed boarding only upon consent of the Master or, if withheld, upon consent of the flag state. The Master was also arrested and detained, and although released, he remains under court order to appear in Algeciras each month, apparently in perpetuity. Although Spanish officials again found absolutely no evidence of any wrongdoing by Odyssey, and although the *Explorer* was released on October 20, 2007, Odyssey's equipment including the ROV (Remotely Operated Vehicle) used in

Odyssey's search and recovery projects was sealed, and despite the lack of any written order, Odyssey has been instructed not to remove the tape which binds the ROV under threat of arrest, and, in effect, attaches it to the *Explorer*, thus denying Odyssey access to its own equipment for use in exercising the very rights granted to it by this Court to continue operations at the Defendant site.

In addition to the forgoing, Spain has intimidated and interfered with some of Odyssey's researchers in Spain, making them fearful to provide services to Odyssey and limiting their ability to work on projects for Odyssey.

Odyssey's damages as a result of Spain's tortious conduct are extensive. At the date of this filing, Odyssey estimates its damages caused by Spain's active interference with Odyssey's civil liberties, business operations and possessor rights to be over Five Million Dollars ($5,000,000.00). Those damages have been carefully documented and may be broken down generally as follows:

| | |
|---|---|
| Interruption of Service of Vessels and Lost Opportunity | $4,560,000 |
| Marine Equipment<br>(Equipment Odyssey was unable to retrieve due to Spain's illegal blockade, and damages caused by Spanish officials to vessel equipment upon capture) | $ 164,000 |
| Freight<br>(Costs to move equipment) | $ 52,000 |
| Contractual Losses<br>(Forfeited production work and expenses incurred from cancellation) | $ 170,000 |
| Travel and Legal Expenses | $ 65,000 |

<u>Loss of Use of Research Services</u>  $ 121,000
    (Researchers)

<u>Artifact Detention</u>  (Uncalculated)
    (Artifacts detained in Gibraltar due
    to Spanish Order – likely suffering
    deterioration)

Odyssey will also present "damage" evidence in this case regarding the costs associated with the recovery and the proper archaeological conservation of the Defendant Site and artifacts therefrom. Such evidence will be related to Odyssey's custodial obligations and salvage claim.

## **PLAINTIFF'S INTERROGATORY #3**

**State the full name, address and telephone number of all persons or legal entities who have a financial interest in this action, and state the basis and extent of the interest.**

Odyssey Marine Exploration Inc. is a publicly traded company on the NASDAQ exchange with approximately 6,000 shareholders, each of whom will have a financial interest in this action as the stock value of the company may depend upon the outcome of the litigation. Also affected will be employees, suppliers, and contractors. Additionally, when and if the identity of a particular ship associated with the Defendant Site is confirmed, there may be parties who will have a cultural and/or legal interest in the wreck. As ODYSSEY has noted in its pleadings, notice to such parties will be provided.

## PLAINTIFF'S INTERROGATORY #4

**Describe the nature of any dispositive motion(s) which the plaintiff anticipates may be filed in this action.**

ODYSSEY anticipates that it will file Motions for Summary Judgments based upon legal issues involved in the action including but not limited to the issues raised by Claimant, Spain, of alleged sovereign immunity and assertion of a unilateral and general refusal of salvage. ODYSSEY also anticipates that following completion of discovery, it will file a Motion for Summary Judgment granting ODYSSEY title to the Defendant Site and/or an appropriate salvage award for its recovery efforts.

ODYSSEY MARINE EXPLORATION, INC.

By: _____

_Greg Stemm_
(Print Name)

_Co-Chairman_
(Title)

STATE OF FLORIDA

COUNTY OF _Hillsborough_

## VERIFICATION

BEFORE ME, the undersigned authority, appeared _Greg Stemm_ as _Co Chairman_ of Odyssey Marine Exploration, Inc., who is <u>personally</u> known to me or who produced _____ as identification, who swears and deposes that he/she has read the foregoing Answers to Standard Interrogatories and that the same are true and correct to the best of his/her knowledge and belief.

SWORN TO AND SUBSCRIBED before me this 12th day of November, 2007.

_____  Notary Public

My commission expires:

PENNY CUBBEDGE GREENE
MY COMMISSION # DD 378351
EXPIRES: December 9, 2008
1-800-3-NOTARY    FL Notary Discount Assoc. Co.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 13, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to James A. Goold, Covington & Burling LLP, 1201 Pennsylvania Ave., NW, Washington, DC 20004; and David C. Banker, Bush Ross P.A., 220 S. Franklin Street, P. O. Box 3913, Tampa, FL 33601, *Attorneys for Claimant, Kingdom of Spain.*

s/ Allen von Spiegelfeld
Allen von Spiegelfeld – FBN 256803
avonsp@fowlerwhite.com
Eric C. Thiel – FBN 016267
ethiel@fowlerwhite.com
FOWLER WHITE BOGGS BANKER P.A.
P.O. Box 1438
Tampa, Florida 33601
(813) 228-7411
Facsimile: (813) 229-8313
Attorneys for Plaintiff